And representing the official committee, Mr. Colbert. Thank you, Your Honor. I'm Michael Colbert on behalf of the Official Committee of Unsecured Predators. We're here today on an appeal of four separate orders from a bankruptcy court, which resulted in one consolidated appeal before the district court. All of these orders relate to, to some degree, the two applications filed by Chase Bank as a secured creditor. One, for payment of an over-secured claim under 506B for post-petition interest. And two, a claim under section 507B for demonition, the decline in the value of its collateral during the course of the bankruptcy case for $14 million. Those two claims resulted in a settlement with the trustee. We filed objections to the settlement. The committee filed applications to value the secured claim. And the committee filed its . . . What was the 507 claim? The 507B claim was the demonition claim, Your Honor. The demonition claim is for the decline in the value of a collateral. The case in point is SCOPAC, which is a Fifth Circuit case, which basically explains and defines what a demonition claim is. This case was originally filed in February of 2010. Chase is a secured creditor with a secured claim of $40 million. The other secured claim was owned by J.P. Morgan, who had a secured claim of $34 million. The difference between the two creditors is one had a secured claim on the working capital assets, S.J.P. Morgan, and Chase had a secured claim on the principal asset of the estate, which was a refinery. There were significant unencumbered assets, including a terminal, a tank farm, some real property, and Chapter 5 claims against the principals, which resulted from basically dissemination of $25 million that was loaned to them by Chase within two years prior to the bankruptcy case. In any case, once the case was filed in February, there were cash collateral orders that were entered, which are significant. The cash collateral orders provide, in essence, that all the cash that comes into the coffers is subject to the liens of the working capital lender, J.P. Morgan, and all the cash is to be applied to that debt as it comes in before it's used for any other purpose. Under the terms of the intercreditor agreement, the cash collateral accounts were managed by Mr. McCarthy, who was the Chase bank representative, who oversaw the distribution and collection of the accounts. The idea when the case was filed was to get a quick sale because the asset was diminishing in value given the current market and the crack margins in the oil and gas industry. They were losing millions of dollars every month. So in order to preserve any value, they wanted a quick sale. They hired Global Hunter and Michael Smith to find buyers. They went out and found buyers after basically a significant due diligence, and they were focusing in on a sale of approximately $16.7 million. That was the highest offer. They were closing on that sale, and disaster struck. The terminal blew up. So push comes to shove. They couldn't do anything. They couldn't go forward with the sale. The FTI, the corporate reorganization officer, packed their bags and left town. They didn't see any way to get paid. And the bank, together with the intercreditors, appointed Mr. Mueller as trustee. Mr. Mueller did a great job. He basically got the terminal and the refinery back online. He repaired the exploded parts and basically got everything up and running. In November, by November, December, because of his efforts and because of the change in crack margins, the refinery was making all kinds of money. He seemed to get more litigation out of successful. He was successful. That's right. I understand. Maybe because there's money there. Well, that's probably part of the problem. The end result is that by April we had a buyer, New Star. They offered $40 million, $41 million for the fixed assets. The fixed assets were the refinery, the tank farm, and the adjacent property. They also offered $4.8 million for the working capital assets. Then they assumed a bunch of other debt. Basically, the working capital payment would take care of J.P. Morgan. They would have had maybe a little bit more outstanding. And Chase would have a significant amount paid. In fact, there was an allocation of $36 million paid, up from $16 million, $20 million enhancement. Then the rest of the collateral was to be, or the proceeds, was to be allocated under the terms of a plan that was going to be filed. The unsecured creditors perceived these assets, the excess assets, as theirs. Then the other assets were sold. There was a terminal sold in May for $6.5 million, unencumbered. Then there was the Chapter 5 claims that were resolved in December for $5 million against the Gonzalez, unencumbered. Chase, and I provided a little tablet to the panel, assessed the situation three days after the sale. Basically, they acknowledged that they had a $1.2 million deficiency claim. That was Exhibit 35 to the settlement hearing and to the claims objection hearing, to the valuation hearing that occurred in November. For some reason, after that, in July, Chase filed the administrative claims. They claimed they were oversecured. They claimed $6 million in additional interest. So in order to get there, they have to have a $40 million claim paid, and there has to be another $6 million margin. So the value of the collateral has to be $46 million. The committees objected, noting that the sale of the collateral only a month before paid only $41 million for the fixed assets, and part of that was unencumbered. Nonetheless, Chase proceeded. They worked out an agreement with the trustee. Well, Chase said if the left one doesn't get you, the right one will. I mean, you can either choose your poison. I'm oversecured and pay me the interest or pay me the 15 mil on the demonstration. Yeah, they do seem a bit inconsistent. They were oversecured to have a What is a consistent negotiating position? I mean, it seems to me. Well, the demonition claim related to their second lien on the working capital assets, not to the first lien on the fixed assets. But the fact of the matter is their collateral actually increased in value. It went from $16 million to $36 million, a $20 million increase. So even if there was a $14 million decrease, it still didn't net out for them to have a demonition in value claim. We filed an objection to the demonition claim. We filed a motion to value. We filed an objection to the settlement. We went to hearings on Why wasn't approval of the settlement functionally ruling up on those objections? Well, that's what I want to know, and that's part of the reason we're here today. Judge Ackert, and in his own defense, Judge Ackert stepped in for Judge Clark. Judge Clark had been the judge up until September when the settlement was filed, and he took a leave of absence. Judge Ackert put on his hat, came down to San Antonio and sat in court and said, We're going to have a hearing on all these things. He said all these matters, along with the disclosure statement and the objection to the FTI hearing fees, on the same day. And if you look at his findings, he has 30-something pages of findings. All but two of them relate to FTI. Only two pages relate to the settlement and to the claims objection and to the valuation. He said he found Chase to be over-secured, but he didn't say why. He said that this exhibit that we're having here, Chase's own admissions, that they were unsecured, was prognostication. If you look at the other tab, tab 2, this is all the exhibits we submitted to the court, a summary of all the exhibits, five or six, that were produced by Chase, assessing the value of their collateral during the course of the case. And Judge Ackert says he didn't think that those were really relevant to the issues at hand. So he decided that he was going to approve the settlement because it was in the best interest of the case and would speed up the closing of the case. The settlement provided that Chase would be paid $45 million, $45 million. In order to get there, they'd have to have at least a $45 million value in collateral. And at that time, the only Chase asset that was sold was a refinery. There were two other assets that had not yet been liquidated that Chase had a lien on. There was an ATI receivable, which was 1.7, which was tied to the Gonzales claim. That had already been — that was wiped out with the Gonzales settlement. Gonzales settlement. They released them in the Gonzales settlement. They signed a release. They got zero. Then they had a claim they said was their insurance settlement claim, which they said was worth $5.5 million, although Mr. McCarthy valued it in his memorandum at $1 million. And at hearings, he couldn't testify what it was. And Mr. Moeller said he had no idea what it was. So there was no real evidence of those values. They didn't bring any expert in to testify to the value of the refinery. The only evidence on values was in relation to the tank farm and in relation to the property. And we stipulated the value of the property. So Judge Akrut approves the settlement. He says he thought it was in the best interest of the estate, notwithstanding the fact that he basically took $5 to $7 million out of the pockets of the unsecured and laid it in the bank's hands. We objected, and we filed an appeal, not only of that order, but also of the order which denied — he basically just denied our claim objection. He denied our valuation objection. No rulings, no findings, no anything. In fact, there weren't — What do you exactly want us to do? I want to go back to the bankruptcy court and try this case. You want us to do what? I want to go back to the bankruptcy court and try this case. I think there's error by Judge Akrut. I think there's error in the district court. You want us to take it to the land and tell them to hear hearings on the objections? Yes, sir. Okay. I want to have a hearing on objections, and I want to have a — I want the judge to make findings on the settlement. He didn't make any findings on the settlement. He didn't say how it was going to be fair and equitable or reasonable. He violated TMT, the Supreme Court case, and Cajun Electric, the Fifth Circuit standards, for approving a settlement. He disregarded Chase's burden of proof to establish the value of their collateral. He ignored our objections to their claim. He ignored our application for a valuation hearing. Right after that, the settlement provided that Chase was going to be paid $200,000 up front, and the trustee says we're going to pay it right away, and they're going to get the rest of it when their collateral is liquidated, and then get the rest of it under the plan. The third amended plan was filed in the middle of December and basically said, okay, we already paid Chase $200,000, and we're going to incorporate precisely the terms of the settlement. At this time, Gonzales hadn't been settled, and at this time, the insurance hadn't been settled, but the insurance claim was settled on November 30th, and Gonzales was settled on December 5th. So by the time we get to the hearing on plan on December 9th, we had filed our objections to the plan. The creditors, the unsecured creditors who are in Class 4, voted against the plan. The only creditor favoring the plan, the only class favoring the plan, was Chase, whose settlement was precisely incorporated under the terms of the plan. Judge Ackard, we stipulated in all the evidence from the settlement hearing. Excuse me. Yes, sir. Go ahead. I'm sorry. All the evidence from the settlement hearing was incorporated into the plan confirmation hearing. All the testimony, exhibits, hundreds of exhibits, everything was incorporated. So essentially the same arguments were made, arguing that the plan was not reasonable, it wasn't fair, it wasn't equitable, arguing that the plan under Section 1129A.7 did not pay the unsecured creditors what they would receive in a liquidation proceeding because it incorporated the settlement. We also argued that the Chase was not impaired. Chase wasn't impaired under Section 1142 because their settlement was precisely incorporated. Their secured claim was paid in full. They had no pre-petition claim. The only remaining claim was these two administrative claims. So we objected, and nonetheless Judge Ackard affirmed the plan. We appealed. We got distracted, and we came up here to the Fifth Circuit on equitable mootness concepts. Judge Jones ruled that, no, it wasn't equitably moot. We come back. We go to the district court, or manage the district court, and they consolidated all these cases and made us ruling this January. When they consolidated the cases, they combined all four orders that were being appealed. But in their decision, the district court ruled on the settlement. He boiled it down to the settlement and to the impairment issues. He ignored the claims objection. He ignored the valuation. He ignored the fact there weren't any findings of fact, any conclusion of law, any reasoning with respect to that, and the evidence didn't support those conclusions. He ignored the standards for the settlement because under the settlement, he just went down the rubber stamp requirements that Judge Ackard went down, and he did not make any findings with respect to reasonableness of settlement or the input from the unsecured creditors, or the fact, again, they're taking $5 million to $7 million from the unsecured creditors. We objected to the valuation because, essentially, the value of Chase Collateral, and we've got a chart here, again, on our tab three, which goes down the analysis of all the collateral that was sold, and the maximum value, using this analysis for Chase, was between $37 to $39 million. They don't even have a fully secured claim. They have a slight deficiency claim, which is consistent with Mr. McCarthy's analysis that was made two days after the refinery was sold. Their diminution claim, they claimed the collateral was diminished during the course of the case. We introduced all the exhibits in trial court of all the monthly operating reports. We traced those in this chart on tab four, and this chart starts on the date bankruptcy was filed in February, showing, based on the bankruptcy schedules, the total working capital assets of $31 million. On the time of sale, the working capital assets, according to the monthly operating reports, were filed. This is Exhibit 39. In fact, this was Chase's Exhibit 39. It was $42.9 million. Their diminution argument was based solely on a decline in the value of the working capital assets. So the evidence isn't there to support that as well. So our argument today is, essentially, when considering the fact that bankruptcy is an equitable concept, recreditors are supposed to abide by bankruptcy concepts and take, you know, according to the process. Tell us about that in rebuttal. I'll do that. Thank you. Mr. Gerbo. May it please the Court, the record at the bankruptcy court supports affirming the order approving the Chase settlement and the order confirming the trustee's Chapter 11 plan. Just as a matter of housekeeping, we've divided the argument between Chase Capital and the Chapter 11 trustee to give you the perspectives of the estate's fiduciary and the secured creditor, without whom the trustee could not confirm a plan. The committee's appeal, unfortunately, does not address this circuit's tests for approval of a settlement. Those tests are found in Cajun Electric teaching. In fact, the only mention of Cajun Electric in the appellant's brief is to dismiss it and saying it doesn't apply. But in fact, Judge Eckert, best equipped to handle with an understanding of the case, the dynamics of the case, the facts of the case, and the . . . . . . the statutory language of 502A and B in terms of giving them the right to a hearing upon objection. Well, there is no right to a hearing. The statute says that the court shall . . . Objection made under A, the bankruptcy court shall value the collateral. Shall determine, right? And it doesn't say how the . . . Did he determine the value of the collateral? No, sir. Okay. Well, he approved a settlement which . . . Well, I understand that, but we don't know the value of the collateral. And he says . . . I mean, tell me if I'm wrong, but the statute says that he shall do so upon objection. There was an objection. There was no determination. Why isn't he statutorily entitled to have determination? He did have a determination. He did. He did not. You just told me he didn't. No, sir. He determined the claim. Okay. Yeah, but he didn't determine . . . it says determine shall value . . . bankruptcy court shall value the collateral. Isn't that what it says? Yes, sir. And he didn't do it. He doesn't have to . . . well, it doesn't say how he should do it. And then if you . . . Well, you tell me that he didn't even do it. He didn't value the collateral. He didn't have to make a precise valuation of the collateral in order to approve the settlement. What is your authority for that? The T.H. New Orleans case. Which is what? Which is this circuit's explanation of how valuations under 506 . . . And what does it say? What does the statement that most supports you in that case say? The statement that most supports our position for that is found, I believe, at page 798 of the opinion, Your Honor. And it states simply that the bankruptcy court shall be allowed flexibility on a case-by-case basis in determining the value of collateral for purposes . . . All right, but how does that get around the statute? Maybe I'm misreading the statute. But my notes on this statute say that if the objection under A is made, which it was, the bankruptcy court shall value the collateral and notwithstanding your efforts to try to avoid a direct answer to the question, it says . . . I mean, there's been no valuation of the collateral here. Now, you know, there may be a way you can get out of it, and I don't know how it is, other than you're arguing policy. Well . . . You know, the bankruptcy court ought to have the right to settle cases, and nobody . . . I mean, I think that's, you know, perfectly sound, but I want to know how you square it with the statute. Well, all I can tell you, Judge, is that this Court has repeatedly approved settlements of litigation, which is all the objection to the claim is. Well, you're still not . . . In other words, you're telling me you cannot answer specifically the question I've asked you. That's what you're saying. If the question is what authority did the Court have for approving, allowing our claim, okay, valuing our claim, which was in dispute and in litigation, I will point you to Cajun Electric and to the T.H. New Orleans case. The question on that is, that is, if those cases stand for the proposition that you are asserting, how do those cases square that whole with the statute? Well, the policy . . . I am arguing policy in part, Judge. In my view, and this is just one judge, but statutory language trumps policy every day if there is a specific, unmitigated conflict. Well, that would be a change in the jurisprudence of the United States. Right. So it is. Well, I can tell you how Judge Acker did it, and I can tell you how it was in compliance with this circuit and Supreme Court authority with respect to approval of a settlement. And I can tell you that the uncontradicted testimony, which was elicited from the trustee on the motion to approve the settlement, met those standards. As part of the settlement, our claim was valued. And in fact, bear in mind, Judge, that the parties to the objection were the estate and Chase Capital. The Committee's application to value, the Committee's objection to the claim . . . well, they didn't really object to the claim. They didn't object to our pre-petition claim. They just objected to the award of post-petition interest. The claim was allowed earlier in the case. But the valuation of our claim that you are talking about, the parties to that were the estate on the one hand. The Committee's position was only derivative of the estate's. They didn't have any independent right to have a hearing on the question of whether or not our value was X, Y, or Z. The objection came from both the trustee. The trustee opposed the payment of interest, and the Committee opposed it. But the Committee's objection in the application was superfluous. It was only derivative of the estate. But you're saying that they had no standing to make the objection under 502A and consequently not entitled to the relief that 502B gives to them. Is that what you're saying? Yes. What I'm saying is . . . You're giving me an answer somewhat now to if that's true. They didn't have independent standing. Well, consider it this way, Judge, Your Honors. The parties to litigation have a right to settle. In the case of an objection to claim, the statute says any party in interest can file an objection. If two creditors file an objection to a third creditor's claim, and the first one is tried, and the claim is allowed, does the second creditor have a right to have a separate independent hearing to rehear that case? I don't know. Well, I think not. Why would that not become the law of the case? Why would that not become the law of the case and moot any other objections? The case is not before me. I don't know. But it is what is before you because they are asking to retry an application to value which is nothing more than a mirror image of the motion for 506. I know Judge Ackard, when he had these claims, acknowledged the statute itself. And he claimed, I'm quoting it, that he said that the resolution of one, namely the settlement agreement, resolved the others. He issued three separate orders pertaining to the settlement agreement, the application to value, and the objection to chase this claim. Now, whether one can argue, I suppose, whether that's so or not, but implicit in his ruling is plainly a ruling, a determination, if you will, of those objections. Now, whether it is an adequate determination, one can argue it, I suppose. And I thought there were about three different approaches to that, one of which is heritage. I guess that's the Northern District. But I think most of it, when the Delaware Bankruptcy Court and the Texas Northern Bankruptcy Courts described that heritage viewpoint, which would plainly be this ruling would be within those rulings. But there's at least one circuit that says much longer lines Judge Ackard is talking about. So I guess it kind of comes down to which way we go with them, which one of these viewpoints we go with. Well, I mean what they're claiming, obviously, and we all know that, is they're claiming that you are paid on the basis of the fact that your collateral exceeded the debt, right? Yes, sir. And we don't know that. You don't know that yet. I mean, maybe you do, but we don't have any determination of that. And if there is not an excess value of the collateral, you're not entitled to any interest, post-petition interest. And that's where we're talking about $5 million in which there's been no determination. So, I mean, that's not like, you know, we're just dancing on the head of a pin here. We're talking about $5 million as substance. Well, Your Honor, my time's over, but I would just like to— No, no, no, no. I've taken a lot of your time, and I want to give you a— Let me suggest this to you. This was a hotly contested issue. And the court looked at the settlement within the more broader context of the best interests of creditors. He applied the teachings of this court in Cajun Electric. If you were to force a valuation of every disputed amount, if you would force a trial of every matter, why would there ever be any reason to settle? If you couldn't settle these, how could you ever get a plan confirmed through settlement and negotiation, which is one of the primary purposes? I'm not saying there are not strong policy reasons for your position. I mean, I understand exactly what you're talking about. The word is determination. In the statute, the word is determination, as I recall. The court has to determine. It's kind of like determining a— The question of the impeachment trial is that the objection is made to the determination of conviction, and the conviction was on impeachment by a committee of the whole. And the question is, I didn't get a trial. And that's what the trial is. The Supreme Court said, well, trial is a lot of things. And that's kind of what we're talking about here. What is a determination? Well, Ben, I again would point you to this court's own language in T.H. New Orleans. My suggestion is a friendly one because I think that it's—my suggestion is a friendly one to your position because determination, to me, the word doesn't resolve this question one way or the other, particularly. It doesn't say— As he said, these are intertwined, and so my ruling upon the approval of this—on the settlement approval or not is going to determine these other three issues, and he issued three separate orders. Now, so that is a determination of whether that is adequate for some other independent reason. If he didn't hold a hearing on it, it's a separate matter. I don't know what else he needs before him, I suppose. Well, I mean, Judge Higginbotham is just saying that the word determination has got a lot of grease on it, and it's slicky. And you need to find out and make that argument on that basis. Now, if you can, I don't—has this issue been fully briefed to the satisfaction of the parties, I mean, of overcoming the statutory language? Do you all want to file supplemental briefs on that? Because you can see I'm concerned about it, but I don't know whether the other two judges are or not. We haven't discussed the case. I guess in a lot of ways we were wondering why we got oral argument on the case, Judge, but I guess we know now. But the answer is we'll be glad to brief the question because I think the law is already out there and we'd be glad to walk you through the determination in a more leisurely fashion. How do you reconcile the statute with what you're trying to do or what has been done? Well, that's all I want to know. And I think there's jurisprudence out there that already answers that question, but we would be more than willing—we'd be—enjoy the opportunity. Can you cite that to me and we'll see if it puts enough grease on the term to make it slip and slide where you want to make it slide. So do you want to—who wants to file—do you want to file simultaneous letter briefs addressing this issue by Friday of next week? Would that be agreeable? Is that agreeable? Certainly, Your Honor. Okay. The clerk has got—will send you a notice of that. Simultaneous by the close of business next Friday. Thank you, Your Honor. Is there anything else? No, but you— A week from Friday. No, no, a week from Friday. Yeah, a week from this coming Friday. Okay. So we have a little rebuttal here. No, I think we still have Ms.— Oh, I'm sorry. Yes, we do. Ms. Wilson, we'll hear from you. Good afternoon. May it please the Court. Natalie Wilson for Randolph-Osherow, the liquidating trustee who is the successor in interest to the Chapter 11 trustee. I'd like to, if I may, pick up where Mr. Gerber left off, attempting to answer your question, Judge Jolly, about why the bankruptcy court was not required to make a precise determination of the value of Chase's collateral. And I submit to you that the answer is found in Article III of the Constitution. The settlement—the approval of the settlement mooted all the other pending motions. The application to value, the 506B claim, and the 507 claim. Once the Court—and I think this is maybe where Judge Higginbotham was trying to go to— once the Court approved the settlement, the amount of Chase's secured claim for post-petition interest was established. And there was no reason to go forward with the detailed factual findings and conclusions of law on the other motions. And, in fact, it would have been inappropriate to do so because those disputes were no longer a live controversy. Having said that— Now, that's—he made the request for the determination—the request for the determination was made before the case was settled.  That is correct. And so the bankruptcy court takes the—says, well, I'll just moot that thing right now. I'll settle the case and it'll be mooted. So while he is claiming a right to a hearing, the bankruptcy court over here settles the case and destroys his right under the statute to the hearing to which he was entitled. Now, that sounds something like that that ain't right. Well, with all due respect, sir, the committee did get a hearing. The hearing on October 27th was a hearing on all of the pending motions, as well as FTI's claim. So there was a hearing in which evidence about the value of Chase's collateral, the amount of its claim, and the merits of the settlement were all heard. And the Court decided to approve the settlement, which mooted the other arguments. And also, I don't—I don't think that anyone has a right to a hearing on something that is not a live controversy anymore. So— He said it was intertwined. So the question is that they need a separate hearing. Maybe they're not intertwined, but that's what the bankruptcy court said. The issues absolutely were intertwined, Your Honor, because the trustee under Rule 9019A had to prove that the settlement was in the best interest of the creditors, but also that Chase was likely to prevail if the Court moved forward on the application to value or the 506B claim, that Chase was likely to prevail. All the evidence was the same for all of these motions, I guess, is what I'm getting to. The evidence and the testimony would have been the same. Also, if the settlement motion had been set for hearing before October 27th, before the motion to value was set for hearing, the judge could have heard the settlement motion first and mooted it, and the committee still would not have been entitled anymore to a hearing because their valuation claim and their claim objection would have been mooted by the settlement. So the bankruptcy court, after hearing a very, very full day of testimony, most of which was on the trustee's testimony about the merits of the settlement, was largely unrebutted. The bankruptcy court found that Chase was likely to prevail on its claim for post-petition interest. That the settlement would speed the resolution of this case, and that it was in the best interest of the creditors, because especially unsecured creditors would get paid more under this settlement than they would if the litigation went forward. And that was based on Mr. Miller's unrebutted testimony that the estate did not contain enough assets to pay the administrative claims that were still outstanding, pardon me, a secured claim for post-petition interest in whatever amount the court was likely to find and also make distributions to the unsecured creditors. Now, that settlement was incorporated into the plan that was proposed. And Chase was the only impaired class of creditor that voted in favor of the plan. And Chase was actually impaired. The committee's main objection to the plan is that Chase was not actually impaired. The plan impaired Chase's secured claim by delaying payment of $200,000 that was supposed to have occurred about six weeks prior, but also by containing the releases for the Gonzaleses and their related parties and providing for a channeling injunction that prohibited Chase and any other parties from pursuing their own independent claims against Gonzales. The committee has also made some complaints that the plan is not fair and equitable because it overpays Chase. First of all, we think that because the settlement agreement was properly approved, it could not have been errored to incorporate it into the plan. But moreover, fair and equitable is a term of art under the Bankruptcy Code. It doesn't mean that everybody gets paid even Steven or everybody gets paid as much as they want. It means that the absolute priority rule is not violated. And the committee has not even argued that the absolute priority rule was violated because it wasn't. Nobody with an interest that is junior to the committee's interest receives or retains any property. That is what is required for 1129A.7. It's what is required for the fair and equitable finding, and it's what is required for 1129B.2.B.B. Romanet II. That's a long one. And so, Your Honors, I would submit to you that the committee has not met its burden of showing that the Bankruptcy Court abused its discretion in approving the Chase settlement under the factors iterated in Cajun Electric and in T.H. New Orleans, nor has the committee even argued or provided any authority showing that or to explain why the settlement did not moot the valuation claim or the claim objection. There are only three exceptions to Article III mootness, and that is when one issue in a case is moot but the others aren't, an issue that is capable of repetition, yet a debating review, or when a party voluntarily ceases the disputed behavior, such as voluntarily terminating illegal behavior. None of those are present here. The committee has also not shown that the Bankruptcy Court erred in approving the confirmation or that the District Court erred in affirming both of those orders. You asked Mr. Colvard what he wants out of this appeal, and he said that he wants to go back and have a trial on these issues. With all due respect to Mr. Colvard, it ain't going to happen. And I'll tell you why. If you look at the chart that the appellees have provided on pages 51 to 52 of the brief, you will see that if we go back to trial and have a hearing on the valuation claim in the 506B motion, Chase is more than likely going to be able to prove that it was oversecured to the tune of, I think, $4.6 million. They will get a secured claim that is about $4.6 million on top of the $40.2 million they've already been paid. Let me back up. There will be no representative of the estate if this plan is unconfirmed because the liquidating trustee's authority derives from the plan, and the Chapter 11 trustee has been discharged. So there's no one to represent the estate. So we go back. Somehow, maybe there's a trial on these things. Somebody is going to convert this case to Chapter 7 because there will not be sufficient assets to pay the secured claim of Chase and any administrative claims, more likely than not. And in this waterfall scenario, and based on the unrebutted testimony of Mr. Miller from October 27, 2011, there is not enough money to pay the secureds. The only hope the unsecured creditors have of getting paid is under this settlement and under this plan. For all those reasons, Your Honors, we ask that the district court be affirmed. Thank you. Okay. Thank you, Ms. Wilkson. Now we'll hear from Mr. Carver to rebuttal. Thank you, Your Honor. I want to address the constitutional immunity issues that were raised by Ms. Wilson. We did submit in our reply brief. As a practical matter, though, what she just said as she wound up makes sense to me. There ain't nothing there. Why do you want to start over again when there's nothing there? Chase has stuffed between $5 million and $7 million in their pocket. Their payment of their prepetition claim approved by the order of the court in August was made subject to the rights of the parties to address that very issue. So you can get your money out of their pockets. We can get our money out of their pocket, and there's still money within the bankruptcy estate. It has not yet been distributed because they're still fighting with some claimants that haven't been resolved. If you think you can get your money, I mean, it ain't moot. It is not moot from our perspective. We wouldn't be here fighting. Well, I mean, not moot. I mean, it's not hopeless. It's not futile. It's not hopeless. It's not futile. The waterfall that was submitted by the trustee projected a waterfall after they had already paid Chase, and Chase had lined his pockets. And that waterfall was before the recovery of $5.5 million from the Gonzalez. You could also address mootness if you wanted to. The mootness issue, the constitutionally moot issue, applies where a settlement occurs and the parties go back and try and reinvent the wheel after the settlement has occurred. That's not what happened in this case. We filed our objections to the administrative post-petition claims of Chase before the settlement agreement was filed. The settlement agreement was filed, and every one of those matters were set for hearings on page 1 of the docket on November 1, and every one of those matters were set for hearing. Judge Ackard's decision and his findings, he denied our objections and claims. We went forth. We produced appraisers. We produced the testimony from the sales. We had a full-blown hearings on all those issues before he decided to go ahead and rule on the settlement. In his findings, he didn't even rule on our claims objections or valuation issues. He simply, he disregarded them and simply entered orders after that. You developed fully your record with regard to your claim. Excuse me? You developed fully your record with regard to your position. Absolutely. We produced, you know, 40 or 50 different exhibits. We produced evidence. We introduced stipulations. We had several days of testimony on our specific claims. The hearings were all consolidated, but there was testimony and evidence adduced at time of trial on each one of those issues. He could not simultaneously approve the plan as it was and grant the relief you want. Implicit in his approval of the plan is a rejection of your position, which is made up on a fully developed record by you. That's what they're saying. That's their argument they're saying. That's what you're saying, and so what it boils down to is that he didn't articulate specific findings of fact, but you had every opportunity to present those facts and so forth, and those are the facts that he had to have implicitly rejected in order to approve the plan. That's exactly right. We produced the evidence. What I'm suggesting to you, by your own statement, there's nothing to go back to develop a record. It's that you want to go back to the district court to see if you can undo the sale and get a different determination. It's been determined. Now, he could go back and put on a different hat and say, okay. But as a practical matter, they settled it. On remand, it was remanded to the district court or it was remanded to the bankruptcy court. The problem is there's a lack of findings on the issues that were presented, and they're insufficient to support any of the rulings either from the district court or from the bankruptcy court. There are absolutely no findings or conclusions with respect to the claims or valuations. I understand. The findings and conclusions. I understand, but all I'm doing is trying to say that that's needed in your hearing. I appreciate that. On remand, they can review the record and make a decision based on the record. You want a determination made on the basis of evidence. That's correct. A specific one instead of the one that the judge gave him about the misdeeds. You want findings of fact and conclusions of law based on your presentation. That's what it boils down to. There's nothing else to do. The court can remand for the purpose of making findings in support or remand for the conclusions based on the appropriate findings that should be made. The evidence does not support a conclusion that the settlement should be approved. The evidence, once the court makes a determination of value, cannot in any way support a settlement paying Chase $5 to $7 million in excess of the value of their secured collateral. The only evidence at the time of trial, the only sale, and Mr. Gerber quoted T.H. New Orleans. T.H. New Orleans stands for the proposition that the value of a secured creditor's assets is determined upon, after the case is filed, is determined upon sale or disposition of the asset. That asset was sold on April the 15th, and it produced substantially less than $40 million of secured claim. It produced somewhere around $36 million. In fact, that's the precise amount that was allocated to them under the terms of that order. How did they get from $36 million to $46 million is what we're here today fighting about, and that's the evidence of the value. How can a court approve a settlement without finding value that's already been determined by order? Okie doke. Got a little red light there. Well, I mean, I would think, you know, five pages maximum. I would say, wouldn't you, sir? I mean, I guess your lawyers are paid by the word. You ought to want a 25-page limit. I mean, I can make up my mind in three pages to be true. Can I get a better understanding of exactly what is to be briefed? Well, what is to be briefed is how, and you would say, that the district court's settlement of this case without a determination of a hearing to determine the value, without a determination of value, is error. I mean, in other words, you say you have a right under the statute to that determination. Yes, sir. Judge Higginbotham says determination can mean a number of different things. But the statute itself, I mean, if you just read it plainly and don't try to put any kind of lubricant on the words, indicates that you are entitled to a hearing for a determination of the value of the collateral. Okie doke. Thank you so much. That completes the arguments we have on the four-argument calendar for the day.